**Franklin L. Ferguson, Jr., State Bar No. 170875**
**3580 Wilshire Boulevard, Suite #1732**
**Los Angeles, CA 90010-2534**
**(323) 936-4375; (323) 679-1064 (Facsimile)**
**franklin@franklinferguson.com**

**Attorney for Plaintiff, Carmen McGee**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CARMEN MCGEE, an individual,**<br><br>　　　　　　　**Plaintiff,**<br>　vs.<br><br>**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a local government entity of the State of California; NIDAL ALAMMARI, an individual; VIGEN ESMILLIAN, an individual; and DOES 1-10, inclusive,**<br><br>　　　　　　　**Defendants.** | **Case No.**　2:20-CV-10697<br><br>**Complaint for Civil Damages**<br><br>1. **Violation of 42 U.S.C. §1981, Racial Discrimination**<br>2. **Violation of 42 U.S.C. §1981, Retaliation**<br>3. **Sexual Orientation and Gender Identity Discrimination in Violation of Article 1, §8 of the California Constitution**<br><br>**Demand for Jury Trial** |

PRELIMINARY STATEMENT

1.　Plaintiff Carmen McGee brings this action due to the fact that McGee's employer, Defendant Regents of the University of California (hereinafter, "UCLA[1]")

---

[1] The particular situs of the events described herein is the Westwood, CA campus of the University of California at Los Angeles, also known as "UCLA."

1
COMPLAINT FOR CIVIL DAMAGES

and certain of its administrators, officers, supervisors and employees, including Defendants Nidal Alammari and Vigen Esmillian, discriminated and retaliated against her because of her race, her gender, her sexual orientation and due to her engagement in certain protected activities.

2. During her employment with Ronald Reagan UCLA Health System, Ms. McGee has consistently battled a "glass ceiling" with respect to advancement within her chosen profession. The obstacles which have been placed in front of Ms. McGee have nothing to do with her skill, level of experience or even her objective performance outputs. During her tenure with UCLA Hospital, Ms. McGee was paid significantly less than similarly-situated, non-Black employees, despite the fact that she performed equivalent, if not superior, work.

3. The failure to receive equal pay for equivalent work is one of the issues which particularly plague Black women. The perceptions which surround Ms. McGee's status as a Black person are compounded by the fact that she was born female in gender, but has transitioned into a male. As herein detailed, in addition to the pay disparities which marred her first six (6) years at UCLA, Ms. McGee experienced episodes of disparate treatment which occurred at times in direct correlation to her gender transition process. As a Black, transgender, Lesbian, Carmen McGee has experienced adverse employment consequences which have nothing to do with her ability to perform her assigned responsibilities and everything to do with the intractable biases held by her immediate supervisors.

## THE PARTIES

4. Plaintiff Carmen McGee is an individual resident of the County of Los Angeles, within the State of California. At all times relevant to this Complaint for Civil Damages, Plaintiff was a Black, female, Lesbian citizen of the United States, as well as an employee of Defendant UCLA.

5. Defendant UCLA is a local governmental entity, within the State of California. UCLA regularly employs five (5) or more persons and is an "employer"

within the meaning of California Government Code §12900, *et seq*. and as defined in California Government Code §12926 (c) and in California Labor Code §1101, *et seq*. UCLA is in the business of higher education. At all times alleged in this Complaint for Civil Damages, Defendant UCLA acted through its officers, directors, managing agents, servants, supervisory employees and/or representatives.

6. Defendant Nidal Alammari (hereinafter, "Alammari"), at all times germane to this Complaint for Civil Damages, functioned as a supervisor, managing agent, or administrative-level UCLA employee. During the occurrence of the operative facts, Mr. Alammari was a principal agent of UCLA, as that term is defined in California Labor Code §1101, *et seq*. He is sued in both his individual and official capacities.

7. Defendant Vigen (hereinafter, "Esmillian"), at all times germane to this Complaint for Civil Damages, functioned as a supervisor, managing agent, or administrative-level UCLA employee. During the occurrence of the operative facts, Mr. Esmillian was a principal agent of UCLA, as that term is defined in California Labor Code §1101, *et seq*. He is sued in both his individual and official capacities.

8. Plaintiff is ignorant of the true names and capacities of those persons sued herein as "DOES 1 through 10, inclusive," and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint for Civil Damages to allege these Defendants' true names and capacities when ascertained.

9. Plaintiff is informed and believes, and on such basis alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein and that Plaintiff's damages were caused by such Defendants.

10. Plaintiff is informed and believes that, at all times mentioned, each of such Defendants was the agent, servant, employee, co-venturer, co-conspirator, or representative of each of the remaining Defendants and was, at all times herein mentioned, acting within the course, scope, purpose, consent, knowledge, ratification or authorization of such agency, employment, joint venture or conspiracy.

## FACTUAL ALLEGATIONS

11. Ms. McGee was born in 1960. Ms. McGee is a Lesbian and a transsexual. In 1986, Ms. McGee earned her associate's s degree in electronic engineering from National Institute of Technology ("N.I.T."), located in Livonia, Michigan. Ms. McGee's work history includes a role as one of only 4 cockpit operators for the B-1 Bomber produced by Rockwell International (Palmdale, CA). Plaintiff was the only Black female engineer working on that bomber. Plaintiff also worked for Hughes Aircraft (Rancho Santa Margarita, CA). Before landing at UCLA, Ms. McGee worked for Northridge Medical Center and the Henry Ford Hospital Dialysis Department in Detroit, Michigan. Ms. McGee has an extensive and comprehensive technology technician background; she has mastered the "art" that is medical equipment repair and maintenance. On July 3, 2006, Ms. McGee started her work in UCLA's Clinical Engineering Department as a principal electronic technician. From the inception of her UCLA tenure, the quality of Ms. McGee's work was consistently superior.

12. Beginning in 2008, Ms. McGee continued to serve as a principal electronic technician, building upon the significant experience she gained generally while working in the dialysis field and specifically rendering repairs to sophisticated laboratory equipment. Upon her hire, UCLA presented McGee with a great benefits package; she immediately began to have a very positive working experience. Ms. McGee planned to work at UCLA through her intended retirement age of sixty-five (65). When she began, Plaintiff was the only Black female employee within the Clinical Engineering Department. Still in 2008, Ms. McGee was assigned to a new hospital facility. Before the hospital was officially opened, Ms. McGee was given the task of installing equipment, occasionally testing the equipment and maintaining the equipment.

13. Also in 2008, a financial equity adjustment was conducted by UCLA; the university transitioned to a tier program, setting employee rates of pay in conjunction

1  with years of experience. UCLA examined employee rates of pay, in accordance with
2  pre-determined standards. Each UCLA employee's rate of pay was adjusted,
3  purportedly based upon his or her years of experience, job title and grade (rank), in
4  addition to other salient factors. In order to assign the appropriate value for each
5  employee's rate of experience, UCLA management conducted a written employee
6  survey. Each employee was asked to complete the paperwork and submit said
7  paperwork to his or her supervisor. Understandably, employees were excited about
8  the prospect of receiving increases in compensation. Ms. McGee received a raise of
9  approximately $6.00/hour, as a function of her having completed this questionnaire.
10  14.     In the natural course of her assignments, Ms. McGee accumulated a good deal
11  of on-call work. Plaintiff was responsible for the majority of UCLA laboratories, both
12  on-site and off-site, throughout the Los Angeles region. Plaintiff was responsible for
13  the dialysis department, the psychiatric ward and the majority of the hospital. To be
14  "on-call" was to be available for emergency repairs, over a set period of time. Ms.
15  McGee was also given overtime assignments. Ms. McGee was extremely competent
16  as a UCLA employee. She was asked by Manager Nidal Alammari to create and
17  present a PowerPoint presentation concerning hospital bed maintenance. Prior to the
18  discrete and insular acts of retaliation which are herein described, Ms. McGee was
19  responsible for servicing the vast majority of laboratories on site. She was also
20  responsible for handling several off-site facilities, in various Los Angeles locations.
21         15.     From the inception of her UCLA employment until October 5, 2016, Ms.
22  McGee received no contemporary, written disciplinary notices. She was never
23  counseled and was never made aware of any problems with her work product, her
24  demeanor or the manner in which she served UCLA clientele. To the contrary, Ms.
25  McGee distinguished herself with the receipt of three (3) "Star Awards[2]." Star

---

[2]The Star Award wsas suspended in 2013.

COMPLAINT FOR CIVIL DAMAGES

Awards were given to recognize UCLA employee efforts which reflected above and beyond said employee's "call of duty."

16. Ms. McGee earned two (2) of her Star Awards from charge nurses; she garnered one (1) Star Award upon the recommendation of a physician. UCLA departments, supervisors and subordinate staff relied upon Ms. McGee to solve an assortment of problems, even during those occasions when she was not physically on site.

17. In 2013, UCLA employee Allen Hutchinson noticed that his pay rate was insufficient by approximately $0.19/hour. When Mr. Hutchinson consulted with the UCLA Human Resources Department, he learned that the pay scale, and accordingly the pay discrepancy, should have been applicable to all of the hospital employees. Mr. Hutchinson printed the proper pay scale and published it upon a bulletin board, plainly visible throughout the Department. The pay scale included specific references for years of experience and indicated the appropriate rates of pay. At one point, Ms. McGee checked the pay scale and learned that she had been receiving a rate of pay that was insufficient by more than three steps; Ms. McGee was being paid as a Step 9, when she should have been characterized as a Step 12.

18. When Ms. McGee began her work at UCLA, she had already accumulated over twenty-six (26) years of related experience, within the technology technician field. Ms. McGee's pay was deficient by more than $7.00 per hour, a staggering discrepancy. The time frame for this deficiency was from the year 2008 until this discovery in October of 2013. Ms. McGee informed her UCLA management supervisors, who shared with her that they would investigate the reason for her disparate pay. Ms. McGee specifically complained to Mr. Nidal Alammari, Clinical Engineering Manager and Ms. McGee's immediate supervisor, telling him that her pay was markedly inadequate. Mr. Alammari represented that he would investigate the matter. No other Clinical Engineering Employee's pay was disparate by more than

COMPLAINT FOR CIVIL DAMAGES

1 $0.25/hour. Ms. McGee was the only Black employee, similarly situated, within the
2 Department.
3      19.   Mr. Alammari told Ms. McGee that he would investigate and correct her
4 pay. Ms. McGee informed the representative of her local chapter of the American
5 Federation of State, County and Municipal Employees (hereinafter, "Union"), at the
6 same time that she complained to Mr. Alammari. In spite of Ms. McGee's complaints,
7 the pay disparity continued through April of 2014. Ms. McGee tried to afford her
8 supervisor and union representatives adequate time to do their jobs, but received no
9 assistance during that time frame. When Mr. Hutchinson had notified UCLA's
10 Human Resources Department, concerning his $0.19/hour pay differential, the
11 problem was addressed and corrected within two (2) days. Ms. McGee returned to
12 Mr. Alammari, who indicated that he had not received information concerning any
13 potential adjustments to Ms. McGee's pay disparity. From this response, Ms. McGee
14 surmised that neither Mr. Alammari nor any of his superiors had addressed her pay
15 disparity. Ms. McGee was familiar with Mr. Alammari's work tendencies; Mr.
16 Alammari was extremely quick with respect to addressing workplace issues. His
17 practice was to consult with his immediate supervisor, as well as persons more senior
18 in the management structure.
19      20.   At this point, in or about November of 2014, Ms. McGee appealed to
20 Richard Azar, Director of Service Employees. When he learned about Ms. McGee's
21 pay differential, Mr. Azar informed Ms. McGee that he would address the pay
22 differential within two (2) days. The day after Ms. McGee spoke to Mr. Azar, Mr.
23 Alammari reprimanded Ms. McGee, telling her that it was unnecessary for her to have
24 involved Mr. Azar, Mr. Alammari's superior. Mr. Alammari told Ms. McGee that he
25 had been occupied with several issues but had intended to address her pay
26 differential.
27      21.   Within a matter of days, Ms. McGee received a letter from Human
28 Resources, including a promise that her pay differential would be corrected. Ms.

1  McGee received a three-step pay increase, amounting to approximately $6.00/hour in
2  additional compensation. Due to the delay in addressing her situation, however, the
3  pay differential required a four step bump, or an approximately $8.00/hour increase.
4  Ms. McGee next inquired about her receipt of retroactive pay from 2008 through the
5  date that she received the three step pay increase. Mr. Alammari told Ms. McGee that
6  he did not believe UCLA would provide retroactive pay. Ms. McGee immediately
7  protested that she was entitled to receive retroactive pay and informed Mr. Alammari
8  that she would involve her Union representative.

9     22. In an effort to obtain retroactive pay, Ms. McGee next met with Mr.
10 Alammari, David Barbrow, Assistant Director of Clinical Engineering, Mr. Vigen
11 Esmillian, Director of Clinical Engineering, and Human Resources representative Mr.
12 Maurice McGlaughlin. The Union representative, Ms. Teresa Avendano, was also
13 present. During this meeting, Ms. McGee was told that she would not receive
14 retroactive pay, in spite of her proof that she had entered the position boasting 26
15 years of experience. Ms. McGee was treated as if she had only 3 years experience,
16 when she initiated her position. Non-Black employees were not treated in this
17 fashion. Ms. McGee was specifically told that she would need to bring a civil court
18 action, if she wanted to receive such relief. In a chilling tactic, Mr. McLaughlin went
19 as far as to indicate that Ms. McGee was at fault for the pay differential because she
20 "should have been aware" independently of the pay disparity.

21     23. By its non-action, the Union ratified UCLA's decision to deny retroactive
22 pay to Ms. McGee. The Union advised Ms. McGee to obtain private legal
23 representation in order to procure retroactive pay. Ms. McGee next tried to meet with
24 Dr. David Feinberg, the Chief Operating Officer of the hospital, but was not
25 successful in obtaining an appointment. Ms. McGee feared that she would receive
26 retaliation for engaging in the protected activity of demanding retroactive pay.
27 Though she felt victimized, Ms. McGee ultimately decided that she would not
28 formally pursue retroactive pay in 2014. Ms. McGee did not want to lose her job as a

retaliatory consequence of seeking retroactive pay. Ms. McGee suffered a great deal of emotional trauma with respect to her inability to recoup retroactive pay. Ms. McGee felt defeated at the prospect of UCLA's failure to make her whole. UCLA had taken advantage of Ms. McGee for more than five (5) years. These pay disparities suffered by Ms. McGee continue, through her last date of UCLA employment.

24. On May 13, 2015 Ms. McGee begin to transition from the female gender to the male gender. Prior to that point in time, Ms. McGee identified as a Lesbian with masculine tendencies. When she began her transition, several physical changes to her body were immediately apparent. Facial hair, weight loss and vocal intonations were some of the changes manifest upon Ms. McGee's initiation of her gender transition. In or about August of 2015, Mr. Esmillian approached Ms. McGee and began to wash his hands within her vicinity. Mr. Esmillian stared at Ms. McGee, with apparent disdain and returned to his office.

25. Within moments of Mr. Esmillian returning to his desk, Mr. Alammari summoned Ms. McGee to his office. Mr. Alammari informed Ms. McGee that, from that moment forward, she was not allowed to wear a hat in the workplace. Ms. McGee had worn hats for years at UCLA without any ramifications. Countless co-workers, male and female, also wore hats at UCLA, both within buildings and outside. Ms. McGee inquired as to the particular locations where she would be allowed to wear hats. Mr. Alammari indicated that he would let her know within a short period of time, ostensibly admitting that no hat wearing policy existed.

26. Three (3) days later, Mr. Alammari informed Ms. McGee that she could wear hats when entering and exiting the departmental building. Ms. McGee followed this verbally communicated procedure. In the immediately proceeding weeks, Mr. Alammari observed Ms. McGee wearing hats, during the times she was entering and exiting the building. Mr. Alammari summoned Ms. McGee to his office a second time. Changing the verbal policy he had issued, Mr. Alammari instructed Ms. McGee to refrain from wearing hats during the work hours while in uniform. Mr. Alammari

even prohibited Ms. McGee from wearing hats during inclement weather. During this time, similarly-situated, non-Black UCLA employees continued to wear hats on a regular basis, both inside and outside campus buildings. In a blatant act of disparate treatment discrimination, Mr. Alammari's verbal "hat policy" was applied solely to Ms. McGee.

27. In November of 2015, Ms. McGee underwent medical surgery. In connection with the surgery, Ms. McGee engaged in a three (3) month medical leave of absence. Upon her return to work in December of 2015, Ms. McGee noticed that Mr. Alammari, when he saw her in the hallways, stopped speaking with her. Ms. McGee and other UCLA employees have consistently observed Mr. Alammari to greet persons who have returned to UCLA following leaves of absence, of any length. Upon her return to work following hand surgery, Ms. McGee's facial hair became more pronounced. In order to avoid conflict from Mr. Alammari, Ms. McGee continued to use the female bathrooms. This was a major source of stress for Ms. McGee. Ms. McGee did not want to be terminated by Mr. Alammari for expressing herself as a male. She was therefore inhibited from being able to freely express herself as a human being, having transitioned from the female to the male gender.

28. In August of 2016, Ms. McGee was substituting for another employee. Using the program Mpro 3, Ms. McGee made an attempt to upload a document. The Mpro 3 Program is used to track medical equipment. Ms. McGee made several attempts to upload a particular file. Upon each attempt, Ms. McGee named the file "What the A," "What the B," etc. By chance, the program successfully loaded when it was named "What the F." Days later, Mr. Alammari approached Ms. McGee. Mr. Alammari demonstrated to Ms. McGee the file that she had uploaded named "What the F." Mr. Alammari claimed that one of the blood bank managers had brought to his attention the name of this particular file. Mr. Alammari deemed the name of the file to be inappropriate. Ms. McGee immediately changed the file name, using numbers to identify the file. Within a matter of days, Mr. Alammari summoned Ms. McGee to his

office. A member of the administrative staff was also present. Mr. Alammari informed Ms. McGee that he was placing her on an investigatory leave of absence, effective immediately[3].

29. When Ms. McGee had first changed the "What the F" file name to numbers, Mr. Alammari simply said, "thank you." He had no other reaction, expressing no concern with an apparently inadvertent circumstance. Once Ms. McGee learned that her investigative leave was to begin instantly, she immediately complied. Ms. McGee understood that she would be made to leave the campus and would not be allowed to return until formally notified. The paid investigatory leave began on or about September 1, 2016. Similarly situated persons have not been placed upon administrative investigatory leave of absence as a consequence for having inadvertently named files inappropriately.

30. Ms. McGee signed a document acknowledging the fact that she had been placed upon administrative investigatory leave. Ms. McGee was formally escorted from the UCLA campus, to initiate the investigatory leave period. When she was escorted from the UCLA campus, the filename incident had occurred approximately seven (7) days earlier. Ms. McGee suffered from severe symptoms of emotional distress, as a result of this disproportionately adverse employment consequence. For more than a month, Ms. McGee was left to wonder about her job security. Ms. McGee did not know whether she should initiate a job search.

31. On or about September 21, 2016, Ms. McGee was notified that she would meet with her management staff during the first week of October, 2016. At this meeting, Ms. McGee was accompanied by a Union representative. The Human

---

[3]Through her Union, Ms. McGee timely grieved the investigatory leave of absence. During that process, Ms. McGee questioned the Human Resources representative and inquired as to the reason the investigatory leave was implemented in the absence of any discussion with Ms. McGee's co-workers to ascertain whether they had also experienced problems loading that particular file.

1  Resources representative present went out of his way to indicate that "no one" with
2  whom he spoke "had said anything positive about" Ms. McGee. According to this
3  Human Resources representative, various UCLA personnel indicated that Ms. McGee
4  was rude and intimidating. When Ms. McGee asked for contemporaneous
5  documentation of examples relative to such allegedly inappropriate behavior, the
6  Human Resources representative was not able to provide a response. Instead, the
7  Human Resources representative indicated that management would determine the
8  nature of her punishment and provide notice.

9       32. At one point during the October of 2016 meeting, the Union
10 representative asked management officials whether they were aware of the fact that
11 Ms. McGee had never been previously reprimanded for any behavior during her job
12 tenure. Plaintiff had never before been issued written discipline. She had never before
13 been counseled, nor been the object of any prior disciplinary problems. Specifically
14 the Human Resources representative identified Mr. Paul Colanna, Laboratory
15 Department Director, as a person who did not want Ms. McGee to continue servicing
16 his Department. Ms. McGee was told that she should not retaliate against Mr. Paul
17 Colanna or anyone else in the Laboratory Department.

18      33. The October of 2016 meeting was not documented and Ms. McGee was
19 sent home. Ms. McGee was continued on her paid investigatory leave for another
20 week when she received a phone call from Mr. Alammari. He informed her that she
21 was to report to work the next Monday, in full uniform, ready to resume her
22 employment duties. Mr. Alammari further instructed that he would provide a
23 document for Ms. McGee to sign, as soon as he arrived to the office. When she
24 arrived at UCLA, Ms. McGee learned that she had no Laboratories represented on her
25 work schedule. Mr. Alammari came to the work site and presented Ms. McGee with a
26 five (5) page Disciplinary Notice. Pursuant to this Notice, Ms. McGee was placed on
27 a two-year probation based upon allegations of being "rude."
28

34. Prior to her receipt of this written Disciplinary Notice, Ms. McGee had received no contemporary documentation of any workplace deficiencies. Ms. McGee understood that Mr. Alammari was trying to terminate her employment, without justification. In a further act of retaliation, 70% of Ms. McGee's work responsibilities were replaced with an assignment to the Medical Procedure Unit (hereinafter, "MPU"). Ms. McGee had less familiarity with the MPU medical suites, including several new equipment items, located within the MPU and upon which she had not yet been trained.

35. This alteration of her job assignment necessitated Ms. McGee's independent acquisition of equipment service manuals, consultation with other technicians and becoming familiar with various new items of equipment. Ms. McGee was forced to initiate such precautions in an effort to avoid omissions, or any small errors within the scope of her work. Ms. McGee understood that she was being placed into an untenable situation; the equipment to which she was newly assigned to maintain and repair was highly technical. Normally, persons working upon these particular items of equipment have been formally trained, often in school. Mr. Alammari indicated to Ms. McGee that, due to her years of experience, she "should be able to ascertain an understanding of the new equipment," solely by reference to the pertinent manuals.

36. In October of 2016, when she returned from her investigatory leave of absence, Ms. McGee experienced a number of signs of severe emotional distress. Ms. McGee was only able to work in two (2) or three (3) day segments of time, before taking time off from work, due to the stress associated with having to absorb and master new information on a constant basis. Ms. McGee suddenly found it very difficult to sleep at night. Her blood sugar levels were also elevated during this time. Ms. McGee found it difficult to eat properly due to the stress at work. On account of this stress, Ms. McGee was faced with the prospect of having her December 2016 surgery rescheduled. Ms. McGee was medically ordered to remove herself from the

1 workplace, via stress leave, at the end of October, 2016. Ms. McGee engaged this
2 stress leave through January 9, 2017.
3     37. When she returned from her medical leave of absence due to stress on
4 January 9, 2017, Mr. Alammari continued to subject Ms. McGee to disparate
5 conditions, amounting to adverse employment consequences. Mr. Alammari told Ms.
6 McGee that she could not wear "ear-bud" headphones while engaging in any work-
7 related activities on the campus. Similarly situated employees outside Ms. McGee's
8 class of Black Lesbian transsexuals freely wore ear-bud headphones during the
9 workday, specifically on the UCLA campus and within the Reagan Hospital.
10     38. Ms. McGee consciously avoided Mr. Alammari's path, so that she would
11 not be harassed further. At one point, Mr. Alammari scrutinized certain equipment
12 test values which Ms. McGee reported. These test values, or scores, were recorded
13 relative to certain equipment inspections. Ms. McGee indicated that she could only
14 report the test values actually reflected by the testing equipment.
15     39. Mr. Alammari also subjected Ms. McGee to a disparate policy with
16 respect to taking leaves of absence from work. Ms. McGee was told that she needed a
17 doctor's note for every occasion of her absence. No other employee in similar situated
18 circumstances was made to submit a doctor's note for every absence at UCLA
19 Hospital. On more than one occasion, Mr. Alammari failed to complete Ms. McGee's
20 timesheet resulting in late payments to Ms. McGee. As a result of these actions, Ms.
21 McGee was not able to take full advantage of the UCLA leave of absence policy,
22 contrary to the ability of her peers.
23     40. While already under stress leave, Ms. McGee underwent surgery on
24 December 16, 2016. Ms. McGee returned to UCLA on January 9, 2017, at the
25 culmination of her stress leave. When Ms. McGee returned to work on January 9,
26 2017, she learned that she had been removed from the on-call sheet. As stated above,
27 Ms. McGee had been on the on-call sheet from the moment she began work at UCLA.
28 In a form of discriminatory pretext, Ms. McGee was told that she had been omitted

from the on-call list because she had medical restrictions associated with her leave of absence. Prior to her gender transition, Ms. McGee had experienced surgical procedures and returned to UCLA with medical restrictions. These "pre-transition" medical restrictions were never used to prevent Ms. McGee from being placed onto the on-call schedule. The on-call schedule was an opportunity for Ms. McGee to earn additional income, upon which she and similarly situated UCLA employees economically depended.

41. For each on-call stint that Ms. McGee has worked she has earned an average of $10,000.00. Being deprived of three (3) on-call periods from January of 2017 through June of 2017 equates to approximately $30,000.00 in lost income for Ms. McGee. This economic loss flows directly from Mr. Alammari's punitive decision to remove her from the on-call list. Ms. McGee's income was severely impacted by the lack of on-call shifts.

42. Also in the summer of 2017, Ms. McGee was held to a disparate standard of productivity, as compared with similarly-situated employees, outside the protected classifications. Mr. Alammari indicated to Ms. McGee that, with 93% productivity, Ms. McGee had not met the Department goal of 96% productivity. As a result, Ms. McGee was suspended two (2) days, without pay. Conversely, Allen Hutchinson, with a 90% productivity rating, during this same timeframe, received an Exceeds Expectations" performance rating.

43. The hateful treatment to which Mr. Alammari has exposed Ms. McGee has been ratified by certain of Mr. Alammari's UCLA superiors. On several dates, during the summer of 2017, Mr. Vigen Esmillian came into the office that Ms. McGee shared with co-worker Armando Espinoza. Accompanying Mr. Esmillian was his adolescent son. Mr. Esmillian introduced his son to Armando Espinoza. In making this introduction, Mr. Esmillian blatantly walked his son directly past Ms. McGee without speaking a word, rendering a glance or any other acknowledgement of her presence. Mr. Esmillian did not introduce his son to Ms. McGee. Once Mr. Esmillian

left the room with his son, Armando Espinoza apologized to Ms. McGee. Armando Espinoza specifically reflected the fact that Mr. Esmillian had ignored her, exposing her to an ostensibly painful and embarrassing experience. Armando Espinoza acknowledged the fact that he is a Grade 2 while Ms. McGee is a Grade 3 employee, emphasizing Ms. McGee's decidedly longer UCLA tenure. These facts for the basis of Mr. Espinoza's conclusion that Ms. McGee was equipped with considerably more information about UCLA Hospital that could have been shared with Mr. Esmillian's son.

44. Annually, an Equity Bonus is awarded to Ms. McGee and her peers, traditionally disseminated in October or November. 2017 marked the very first occasion that Ms. McGee failed to receive such a bonus. As of January 2, 2018, on account of the persistent harassment and discrimination that she suffered at the hands of Respondents, Ms. McGee was forced to resign, being constructively terminated.

## **FIRST CAUSE OF ACTION FOR RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. §1981**
**(By Plaintiff against Defendant UCLA)**

45. Ms. McGee repeats and realleges the allegations contained in paragraphs 1 through 44, inclusive, as if fully set forth herein.

46. As a direct and legal result of the conduct of Defendants and each of them as set forth above, Ms. McGee has suffered special damages for lost earnings and sums due pursuant to the aforescribed adverse employment consequences, in an amount not yet fully known. In addition, Ms. McGee suffered and will continue to suffer special damages, in an amount not yet ascertained, for emotional, physical and psychological injuries she suffered as a direct and legal result of the conduct of Defendants, all as set forth above. Ms. McGee has also suffered consequential economic injury in an amount not yet ascertained, as a direct and legal result of the conduct of Defendants, all as set forth above.

47. As a direct and legal result of the conduct of Defendants as set forth above, Ms. McGee has suffered general damages including but not limited to economic injury, damage to Ms. McGee's reputation, pain and suffering, humiliation, embarrassment, and grievous emotional, physical and psychological injury. Defendants, by their actions as set forth above, have engaged in despicable conduct, exposing Ms. McGee to cruel and unjust hardship, with the intention to cause injury to Ms. McGee and with conscious disregard of her rights. Defendants occupied a position of trust which gave them power to damage Ms. McGee' ability to earn her livelihood. Defendants abused that position of trust by maliciously, fraudulently and oppressively subjecting Ms. McGee to the circumstances aforescribed. Ms. McGee has been compelled to seek legal services to redress the discriminatory actions taken by Defendants and, therefore, seeks reasonable attorney's fees in an amount according to proof at trial, pursuant to 42 U.S.C. §1988.

48. According to 42 U.S.C. § 1981, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

49. As a result of the conduct described above, Plaintiff was deprived of her right to be employed in a manner that is free from racial discrimination, as heretofore described. As a direct and legal result of the acts and omissions of Defendants, and each of them, Plaintiff has suffered damages, including, without limitation, loss of enjoyment of life, pain and suffering, emotional distress, medical expenses, attorneys' fees, costs of suit and other pecuniary losses not yet ascertained.

50. Mr. Arellano was McGee was qualified for the position she held. In spite of her qualifications, via the separate and distinct actions related above, Defendant UCLA discriminated against Ms. McGee on account of her race, African American.

1 Similarly situated employees were not subjected to disparities in compensation.
2 Defendants subjected Plaintiff to the aforementioned illegally disparate conditions of
3 employment, also known as adverse employment actions. Such acts and omissions by
4 Defendants evidence discrimination against Ms. McGee with respect to the terms,
5 conditions and privileges of her UCLA employment. In so doing, Defendants acted in
6 contravention of 42 U.S.C. §1981.

7     51. As a direct and proximate result of Defendant UCLA's acts and
8 omissions as described above, Ms. McGee has suffered and continues to suffer
9 damages, according to proof at trial.

## SECOND CAUSE OF ACTION FOR RETALIATION IN VIOLATION OF 42 U.S.C. §1981

**(By Plaintiff against Defendant UCLA)**

13     52. Ms. Smith repeats and realleges the allegations contained in paragraphs 1
14 through 44, inclusive, as if fully set forth herein.

15     53. By exercising her right to protest discrimination, via her filing of
16 administrative complaints, Plaintiff engaged in activities which are protected by 42
17 U.S.C. § 1981. Defendants' collective decision to subject Plaintiff to the series of
18 adverse employment consequences articulated above, as well as their subsequent acts
19 in furtherance of that decision, all as a consequence of said engagement, constitutes
20 retaliation.

21     54. As a direct and proximate result of Defendants' acts and omissions as
22 described above, Ms. Smith has suffered and continues to suffer damages, according
23 to proof at trial.

24 //
25 //
26 //
27 //
28 //

# THIRD CASE OF ACTION FOR SEXUAL ORIENTATION AND GENDER IDENTITY DISCRIMINATION IN VIOLATION OF ARTICLE 1, §8 OF8 OF THE CALIFORNIA CONSTITUTION

**(By Plaintiff against All Defendants)**

55. Ms. McGee repeats and realleges the allegations contained in paragraphs 1 through 44, inclusive, as if fully set forth herein.

56. As a Black Lesbian female, Plaintiff is a member of a distinct class of persons, who are protected from discrimination Article 1, §8 of the California Constitution. Plaintiff was imminently qualified for her position. In spite of her qualifications, via separate and distinct actions, Defendants discriminated against Plaintiff on account of her race, her sexual orientation and/or her gender identity.

57. Said discrimination was manifest in terms of disparate treatment, in pay and as well as within various patterns and practices of discrimination, including hostile environment harassment. Defendant subjected her to the aforementioned illegally disparate conditions of employment, constituting adverse employment actions. Defendant did not expose similarly-situated persons, employees outside of Plaintiff's protected class, to the same adverse employment consequences.

58. As a direct and proximate result of Defendant's acts and omissions as described above, Plaintiff has suffered and continues to suffer damages, according to proof at trial.

## REQUEST FOR RELIEF

59. WHEREFORE, Plaintiff respectfully requests that judgment enter in favor of Plaintiff and against Defendants and each of them as follows:

a. On all claims, for general and special damages according to proof;

b. On all claims against non-municipal, individual Defendants, for exemplary and punitive damages, according to proof;

c. For costs, prejudgment interest and reasonable attorneys' fees;

d. For such other relief as is just and proper.

## DEMAND FOR JURY TRIAL

60. Trial by jury is hereby demanded for determination of all issues.

**Dated: September 1, 2020**          **Respectfully Submitted**

*/s/ Franklin L. Ferguson Jr.*

**By_____**
**Franklin L. Ferguson, Jr.,**
**Attorney for Plaintiff, Carmen McGee**

COMPLAINT FOR CIVIL DAMAGES